## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                 No. CR 13-2642 JB

LUIS ANTHONY TOBANCHE,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Sentencing Memorandum, filed September 10, 2014 (Doc. 83)("Sentencing Memo."); and (ii) the Defendant's Objection to a Proposed Condition of Supervised Release, filed September 10, 2014 (Doc. 82)("Objection"). The Court held a sentencing hearing on October 2, 2014. The primary issue is whether the Court should apply a 4-level increase to Defendant Luis Anthony Tobanche's base offense level under U.S.S.G. § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony offense. The Court will apply the enhancement, because Tobanche possessed a handgun in connection with a drug-trafficking offense.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed September 2, 2014 ("PSR"), that the United States Probation Office ("USPO") prepared. On March 5, 2013, Tobanche drove himself and two others -- Manuel Ruiz and Edward Chavez -- in a Chevy Impala to the Sandia Casino on the Sandia Pueblo in New Mexico. See PSR ¶ 6, at 3. Tobanche parked in the parking garage and exited the Impala with Ruiz and Chavez; the three men then

rummaged through the Impala's trunk for nearly seventeen minutes[1] while changing their clothes and hats.  See PSR ¶ 6, at 3; Addendum to the PSR at 1, disclosed on September 23, 2014 ("Addendum").  Another car pulled up and backed into a parking space a few spaces away from the Impala.  See PSR ¶ 6, at 3.  Tobanche, Ruiz, and Chavez began walking towards the elevators to the casino.  See PSR ¶ 6, at 3.  Tobanche then walked towards the driver's side of the second vehicle, and, as he got closer, someone in the second vehicle shot Tobanche in the neck.  See PSR ¶ 6, at 3.  Tobanche fled towards the elevators, pulled out a gun, and pointed it at the second vehicle.  See PSR ¶ 6, at 3.  The second vehicle fled the scene, and Tobanche, Chavez, and Ruiz got into the elevator.  See PSR ¶ 7, at 3.  Surveillance footage from the elevator showed Tobanche holding a silver handgun in his right hand, which he passed to Chavez.  See PSR ¶ 7, at 3.  Deputies from the Bernalillo County New Mexico Sheriff's Office were dispatched to the casino, and Tobanche was transported to a nearby hospital to receive treatment for his gunshot wound.  See PSR ¶ 7, at 3-4.

The deputies retrieved the silver handgun from Chavez.  See PSR ¶ 8, at 4.  The handgun was an American Derringer .357 magnum and held two live rounds.  See PSR ¶ 8, at 4.  Forensic examination showed that, although the trigger had been pulled twice and the firing pin had struck the primer of both bullets, the gun had failed to fire.  See PSR ¶ 8, at 4.  The deputies searched the Impala and found a black glove in the open speaker cone of a large speaker that took up most of the vehicle's back seat.  See PSR ¶ 10, at 5; id. ¶ 18, at 6.  The black glove contained a plastic

---

[1]The PSR states that Tobanche rummaged around in the trunk for "approximately fifteen minutes."  PSR ¶ 6, at 3.  In the Addendum to the PSR that the USPO disclosed on September 2, 2015, however, the USPO states: "In viewing the footage this officer ascertained the defendant was the driver of the white Impala and that he spent nearly 17 minutes rummaging through items in the back seat, front seat, and trunk of the vehicle."  Addendum at 1-2.  The Court will use the USPO's updated time estimate of "nearly seventeen minutes," Addendum at 1, from the Addendum rather than the PSR's estimate of "approximately fifteen minutes," PSR ¶ 6, at 3.

bag that had 105.4 grams of pure methamphetamine inside it.  See PSR ¶¶ 10-11, at 5.  The deputies discovered a Mossberg 12-gauge shotgun 500 ATP under the Impala's hood.  See PSR ¶ 10, at 5.  Forensic examination identified Tobanche's palm print on the shotgun.  See PSR ¶ 10, at 5.  The deputies also uncovered a third gun -- a .40 caliber Smith and Wesson pistol -- in the Impala's trunk.  See PSR ¶ 10, at 5.  The deputies conducted a criminal records check on Tobanche, discovered that he was a convicted felon, and arrested him upon his release from the hospital.  See PSR ¶ 7, at 4.

## PROCEDURAL BACKGROUND

On August 7, 2013, Tobanche was indicted on two counts: (i) felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (ii) reentry of a removed alien, in violation of 8 U.S.C. § 1326(a) and (b).  See Indictment at 1-2, filed August 7, 2013 (Doc. 30).  On June 9, 2014, Tobanche pled guilty to being a felon in possession of a firearm.  See Plea Agreement ¶ 3, at 2, filed June 9, 2014 (Doc. 73).  The USPO disclosed the PSR on September 2, 2014.  See PSR at 1.  Relying on U.S.S.G. § 2K2.1(a)(2), the USPO calculates a base offense level of 24 for Tobanche, because he has at least two prior felony convictions for a crime of violence or a controlled-substance offense.  See PSR ¶ 17, at 6.  The USPO suggests a 4-level increase under § 2K2.1(b)(6)(B), because Tobanche possessed a firearm and had 105.4 grams of pure methamphetamine within his reach while he was in the Impala.  See PSR ¶ 18, at 6.  The PSR then recommends a 3-level decrease under § 3E1.1 for Tobanche's timely acceptance of responsibility.  See PSR ¶¶ 24-25, at 7.  The PSR thus calculates Tobanche's total offense level to be 25.  See PSR ¶ 26, at 7.  The PSR assesses a criminal history score of 10: (i) 3 points for Tobanche's 2002 convictions for aggravated battery and aggravated assault, see PSR ¶ 32, at 9; (ii) 1 point for Tobanche's 2003 conviction for evading an officer, see PSR ¶ 33, at 9-10; (iii) 3

points for Tobanche's 2003 convictions for possession with intent to distribute cocaine, and possession with intent to distribute heroin, see PSR ¶ 34, at 10; (iv) 1 point for Tobanche's 2006 conviction for possession of cocaine, see PSR ¶ 35, at 10; (v) 1 point for Tobanche's 2009 conviction for transportation of the proceeds of illegal drug trafficking, see PSR ¶ 36, at 11-12; and (vi) 1 point for Tobanche's 2009 conviction for battery of a peace officer, see PSR ¶ 37, at 11.   Tobanche's total offense level of 25 paired with a criminal-history category of V results in a Guideline imprisonment range of 100 to 125 months.   See PSR ¶ 87, at 20-21.   Because Tobanche's offense carries a ten-year maximum term of imprisonment, however, his Guideline range is cut off at 120 months.   See PSR ¶ 72, at 18; id. ¶ 87, at 21.

### 1.      The Sentencing Memo. and the Objection.

Tobanche filed the Sentencing Memo. on September 10, 2014.   The Sentencing Memo. notes only in passing that the § 2K2.1(b)(6) enhancement is inappropriate in this case and directs the Court to the Objection for Tobanche's argument on the enhancement.   See Sentencing Memo. at 3.   Tobanche filed the Objection that same day, arguing that § 2K2.1(b)(6)(B) should not apply.   See Objection at 1.   Tobanche says that, for § 2K2.1(b)(6)(B) to apply, the United States must prove by a preponderance of the evidence that he committed a drug-trafficking offense.   See Objection at 3 (citing United States v. Gomez-Arrelano, 5 F.3d 464, 466 (10th Cir. 1993)).   Tobanche points out that the United States Court of Appeals for the Tenth Circuit has examined § 2K1.2(b)(6)(B) in circumstances where drug trafficking is the predicate offense.   See Objection at 3 (citing United States v. Serrano, 369 F. App'x 949, 953 (10th Cir. 2010) (unpublished); United States v. Taylor, 413 F.3d 1146, 1154 (10th Cir. 2005)).   Tobanche argues that, whether the defendants in those cases committed drug-trafficking offenses, however, "was not seriously at issue."   Objection at 3.   Tobanche asserts that here, by contrast, there is

insufficient evidence to establish that he was involved in drug trafficking.  See Objection at 5.

Tobanche points out that the methamphetamine found in the vehicle was located inside a glove

"which was in a compartment in the back seat."  Objections at 5.  Tobanche notes that there were

two other people in the vehicle with him and that Ruiz, who was riding in the back seat of the

Impala where the drugs were found, has a history of illegal drug convictions.  See Objection at 5.

Tobanche argues that there is no evidence that he was aware of the drugs, or that he sold

methamphetamine to anyone before, during, or after this incident.  See Objection at 5-6.

Tobanche asserts that, in fact, the PSR explains that he was shot in an unrelated incident only

two months before the incident in this case.  See Objection at 6 (citing PSR ¶ 62, at 16).

Tobanche argues that his possession of a firearm in this case is more likely related to his

perceived need to protect himself rather than any involvement in drug trafficking.  See Objection

at 6.

Tobanche maintains that his case is similar to United States v. Gomez-Arrellano, 5 F.3d

464, 467 (10th Cir. 1993).  According to Tobanche, in that case, officers discovered illegal

drugs, a pistol, ammunition, and drug paraphernalia in the defendant's home.  See Objection at 5.

Tobanche asserts that the Tenth Circuit said that § 2K2.1(b)(6)(B) does not apply when a

defendant's possession of a weapon is coincidental or unrelated to the offense.  See Objection at

5.  Tobanche says that, because there was no indication that drug transactions had occurred in the

residence, and because there was no other evidence of a nexus between the weapon and a drug

offense, the Tenth Circuit held that § 2K2.1(b)(6)(B) did not apply.  See Objection at 5.

Tobanche argues that, "[a]s was the case in Gomez-Arrellano, here there is simply no indication

that Mr. Tobanche was involved in a drug transaction."  Objection at 6.

### 2.     __The United States' Responses__.

The United States responded to the Sentencing Memo. on September 17, 2014.  See United States' Response to Defendant's Sentencing Memorandum, filed September 17, 2014 (Doc. 85)("Sentencing Memo. Response").   In response to Tobanche's objection to the application of § 2K2.1(b)(6)(B), the United States asserts that Tobanche was in control of the Impala, which had three firearms in it -- at least two of which were directly linked to him -- and had 105 grams of pure methamphetamine in an open and easily accessible area.  See Sentencing Memo. Response at 10.  The United States adds that Tobanche rummaged around in the vehicle for several minutes before the shooting occurred.  See Sentencing Memo. Response at 10.  The United States contends that, consequently, "[a]ny claim that [Tobanche] was unaware of the drugs or the guns is simply not believable."  Sentencing Memo. Response at 10.

The United States responded to the Objection the following day, September 18, 2014.  See United States' Response to Defendant's Objection to the Presentence Report, filed September 18, 2014 (Doc. 86)("Objection Response").  The United States notes that Tobanche possessed not one, but two firearms: the pistol that he attempted to shoot and the shotgun found under the Impala's hood.  See Objection Response at 4.  The United States asserts that a third firearm was discovered in the trunk and that a glove containing 105 grams of pure methamphetamine was found in the Impala's back seat.  See Objection Response at 4.  The United States explains that the methamphetamine was not in the possession of any person in the vehicle, but was instead in an open compartment on top of a large speaker box that was easily accessible to Tobanche.  See Objection Response at 4.  The United States argues that a hundred grams is a per se trafficking amount of methamphetamine.  See Objection Response at 4.

The United States says that, for § 2K2.1(b)(6)(B) to apply, a firearm must have facilitated, or had the potential of facilitating, another felony offense.  See Objection Response at 4 (citing U.S.S.G. § 2K2.1, cmt. n. 14(A)).  According to the United States, the Tenth Circuit has likened the word "facilitate" to "embolden."  Objection Response at 4 (citing United States v. Justice, 679 F.3d 1251 (10th Cir. 2012)).  The United States contends that, in United States v. Justice, the defendant was asleep in a parked but running vehicle, had methamphetamine in his pocket, and firearms within reach.  See Objection Response at 5-6 (citing United States v. Justice, 679 F.3d at 1253).  The United States quotes the Tenth Circuit, which said:

> When the defendant is out and about, with drugs on his person and a loaded firearm within easy reach, one can infer that the proximity of the weapon to the drugs is not coincidental and that the firearm facilitated or had the potential of facilitating the drug offense by emboldening the possessor.

Objection Response at 6 (quoting United States v. Justice, 679 F.3d at 1253)(internal quotation marks omitted).

The United States asserts that, "[h]ere, the opposite is the case: the casino video never showed Defendant obtaining access to the .357 magnum, only his firing it and passing it to Chavez, so he may well have had possession of the .357 until he passed it to Chavez."  Objection Response at 6.  The United States says that

> [t]he methamphetamine was within arm's reach when Defendant, the driver, was inside the car, and when he spent 15 minutes rummaging in the trunk for clothing, a second pistol in the trunk was available to him, the shotgun was under the hood, and the methamphetamine [w]as on top of a speaker in the backseat, also easily accessible.

Objection Response at 6.  In response to Tobanche's contention that Ruiz' prior drug-trafficking convictions indicate that the methamphetamine in the Impala belonged to him, the United States says that the same argument can be applied to Tobanche: "He has been convicted of trafficking cocaine, trafficking heroin, possessing cocaine, and transporting $40,000 in drug trafficking

proceeds." Objection Response at 6-7. The United States adds that § 2K2.1(b)(6)(B) applies even if the defendant is never charged with drug trafficking. <u>See</u> Objection Response at 7. The United States contends: "While the amount of methamphetamine here was certainly enough to be possessed to be trafficked, mere possession of this amount of possession is a felony, considering Defendant's prior felony convictions for drug trafficking." Objection Response at 7.

### 3. **The Addendum.**

The USPO disclosed the Addendum on September 23, 2014. Regarding Tobanche's objection to the application of § 2K2.1(b)(6)(B), the USPO states:

> [T]he United States Probation Officer obtained and reviewed additional discovery material which was provided by the case agent. Specifically, this officer thoroughly viewed the video footage portraying the events leading up to the shooting of the defendant and his possession of a handgun. In viewing the footage this officer ascertained the defendant was the driver of the white Impala and that he spent nearly 17 minutes rummaging through items in the back seat, front seat, and trunk of the vehicle. This officer observed the defendant wearing black gloves (initially only on his right hand and then a few minutes later on both hands) and the defendant placing items in and out of three different bags, as well as a black container resembling a milk crate. Based on these observations, this officer concluded that Tobanche had control of the Impala and could have easily been aware of and gained access to the methamphetamine in the speaker box in the back seat. The methamphetamine weighed approximately 105 grams (pure), constituting a (b)(1)(B) level offense under the federal statutes at 21 U.S.C. § 841(a)(1). According to the Drug Quantity Table found at USSG § 2D1.1(c)(4), between 50 and 150 grams of pure methamphetamine yields a base offense level of 32. Thus, the large quantity of pure methamphetamine which was found in an area that was easily accessible by the defendant for a period of approximately 17 minutes supports the four-level increase at USSG 2K2.1(b)(6)(B). Therefore, the United States Probation Officer maintains its position, as outlined in the presentence report.

Addendum at 1-2.

### 4.      **The Sentencing Hearing**.

The Court held a sentencing hearing on October 2, 2014.  See Transcript of Hearing (taken October 2, 2014)("Tr.").[2]  The Court and the parties first took up Tobanche's objection to the  §  2K2.1(b)(6)(B)'s  adjustment.    See  Tr.  at  39:4-53:17  (Court,  Barth,  Kochersberger). Tobanche  advanced  two  arguments:  (i)  there  is  insufficient  evidence  to  show  that  a  drug-trafficking  offense  occurred;  and  (ii)  even  if  a  drug-trafficking  offense  occurred,  there  is insufficient evidence to establish that he was involved in it.  See Tr. at 40:3-7 (Kochersberger). Regarding (i), Tobanche said that there is no evidence that 105.4 grams is a per se trafficking amount of methamphetamine.  See Tr. at 40:15-24 (Kochersberger).  Tobanche added that there is no evidence of drug-trafficking paraphernalia or that the methamphetamine was broken up into smaller quantities for distribution.  See Tr. at 41:4-14 (Kochersberger).  As to (ii), Tobanche reiterated that two other people were in the Impala with him when the incident occurred.  See Tr. at  42:10-12  (Kochersberger).   In  Tobanche's  view,  either  Ruiz  or  Chavez  could  have  been trafficking  the  methamphetamine  alone;  alternatively,  they  could  have  been  trafficking  the methamphetamine  together  and  left  out  Tobanche.    See  Tr.  at  42:10-24  (Kochersberger). Tobanche asserted that there is insufficient evidence for the Court to determine which scenario is more likely than the others.  See Tr. at 43:1-44:14 (Kochersberger).  Tobanche contended that, far  from  establishing  that  he  was  involved  in  trafficking  the  methamphetamine,  there  is  no evidence to prove that he even knew that the methamphetamine was in the car.  See Tr. at 44:21-25 (Kochersberger).

When the United States took the floor, it said that the amount of methamphetamine found in  the  Impala  is  roughly  equivalent  to  a  kilogram  of  cocaine;  in  other  words,  it  is  more

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

methamphetamine than an individual would possess for personal use.   See Tr. at 45:13-25 (Barth).   The United States argued that this situation is not one in which the defendant had only passing familiarity with the car or was only casually acquainted with it.   See Tr. at 47:1-20 (Barth).   The United States highlighted that Tobanche was driving the Impala, he was seen rummaging around in its trunk for fifteen minutes, and a shotgun was discovered under the Impala's hood with Tobanche's palm print on it.   See Tr. at 46:17-47:20 (Barth).   The United States said that, in light of these facts, a preponderance of the evidence demonstrates that Tobanche possessed a firearm in connection with a drug-trafficking offense.   See Tr. at 47:21-48:2 (Barth).   The Court overruled Tobanche's objection and applied the enhancement.   See Tr. at 50:9-53:17 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976 (the "Act"), thus making Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.   Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."   United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in § 3553(a)(2):

**(A)**      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)**      to afford adequate deterrence to criminal conduct;

**(C)**      to protect the public from further crimes of the defendant; and

**(D)**   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct."  18 U.S.C.

§ 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within

the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d

1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338,

349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th

Cir. 2008).  This presumption, however, is an appellate presumption and not one that the trial

court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552

U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial

court must undertake the § 3553(a) balancing of factors without any presumption in favor of the

advisory[3] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

_____

[3]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory [.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is

---

contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002 JB, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

"in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec.14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481.  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes

is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted). In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)). The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines. See 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from 63

to 78 months to 121 to 151 months.  See 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  408 F.3d at 684.  Although United States v. Booker made the Guidelines effectively advisory, the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[4]  "[T]he application of an enhancement . . . does not implicate

_____

[4]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).  See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the

the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[5](holding that, after Alleyne v. United States, "[i]t is well-

_____

defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (holding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

   [5]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

   In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that United States v. Hendrickson, United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009)(unpublished), and United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), United States v. Fent, 199 F. App'x 724 (10th Cir. 2006)(unpublished), and United States v. Waterbury, 206 F. App'x 805 (10th Cir. 2006)(unpublished), all have persuasive

established that sentencing factors need not be charged in an indictment and need only be proved

to the sentencing judge by a preponderance of the evidence").  As the Court has noted:

> The Court explained that, although the decision of the Supreme Court of the
> United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands
> the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts
> that increase the maximum sentence a defendant faces must be proven to a jury
> beyond a reasonable doubt), to cover facts that increase the mandatory minimum
> sentence, as well as the maximum sentence, it does not prohibit district judges
> from continuing to find advisory sentencing factors by a preponderance of the
> evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
> 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M.

Nov. 3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a

different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt.

1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the real conduct that underlies the crime of conviction.  That determination
> is particularly important in the federal system where crimes defined as, for
> example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of
> any article or commodity in commerce, by . . . extortion," . . . can encompass a
> vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in United States v. Booker "suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines."  United States v. Reyes-Vencomo,

No. CR 11-2563 JB, 2012 WL 2574810, at *5 (D.N.M. June 26, 2012)(Browning, J.).

---

value with respect to a material issue, and will assist the Court in its disposition of this Sealed
Memorandum Opinion and Order.

Section 1B1.3 provides that the base offense level under the Guidelines "shall be determined" based on the following:

> **(1)**    **(A)**    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
>        **(B)**    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> **(2)**    solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> **(3)**    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> **(4)**    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The Court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which

the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed with the defendant and dismissed the indictment, holding that punishment for the cocaine

offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution provides.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In <u>United States v. Watts</u>, the Supreme Court, in a per curiam opinion, relied upon <u>Witte v. United States</u>' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  <u>See</u> 519 U.S. at 149.  In reaching its result in <u>United States v. Watts</u>, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  <u>See</u> 519 U.S. at 149 (citing, <u>e.g.</u>, <u>United States v. Coleman</u>, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in <u>United States v. Watts</u> with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.  <u>See</u> <u>United States v. Watts</u>, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  <u>United States v. Watts</u>, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in <u>Witte v. United States</u> and <u>United States v. Watts</u>.  <u>See</u> <u>United States v. Andrews</u>, 447 F.3d 806, 810 (10th Cir. 2006)(applying <u>Witte v. United States</u>' holding to affirm that a career-offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a

preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." 168 F. App'x at 290. The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" 168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug-trafficking crime. See 947 F.2d at 1428. The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges. See 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof which a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene

handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  See 11 F.3d at 1515.  The defendant argued that "because the additional drug quantities effectively resulted in a life sentence[,] a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the guidelines that corresponds to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the

defendant committed the more serious crime); United States v. Cervantes-Chavez, No. CR 14-0259, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court has previously held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal.  See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.).  The Court has also determined that, although it could consider the defendant's silence about information regarding herself or others engaging criminal conduct, it would not rely on that silence to increase the defendant's sentence.  See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 257814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.).  Finally, the Court has concluded that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence.  United States v. Romero, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

## LAW REGARDING § 2K2.1(b)(6)

U.S.S.G. § 2K2.1(b)(6) provides a 4-level enhancement to a defendant's base offense level "if the defendant used or possessed any firearm or ammunition in connection with another felony offense."  U.S.S.G. § 2K2.1(b)(6).  Application note 14 to U.S.S.G. § 2K2.1 specifies that the use or possession is "in connection with" a different felony "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense."  U.S.S.G. § 2K2.1, cmt. n.

14(A).  "The plain and commonly understood meaning of 'facilitate' is to make easier."  United

States v. Marrufo, 661 F.3d 1204, 1207 (10th Cir. 2011).

The Tenth Circuit has held on several occasions that physical proximity between a

weapon and narcotics can be sufficient to satisfy § 2K2.1(b)(6).  See, e.g., United States v.

Bunner, 134 F.3d 1000, 1006 (10th Cir. 1998); United States v. Gomez-Arrellano, 5 F.3d 464,

467 (10th Cir. 1993).  In United States v. Bunner, the Tenth Circuit explained how physical

proximity could establish a nexus between a handgun and a drug-trafficking offense: "Handguns

are widely recognized as a tool of the drug dealers['] trade.  Accordingly, a weapon's proximity

to narcotics may be sufficient to provide the nexus necessary to enhance a defendant's sentence

under § 2K2.1(b)(5)."[6]  134 F.3d at 1006.

The United States Court of Appeals for the Eighth Circuit has noted that, when a person

ventures out into public with a firearm and even a small amount of drugs, "there are many ways

in which the weapon can facilitate the drug offense and dangerously embolden the offender."

United States v. Regans, 125 F.3d 685, 687 (8th Cir. 1997).  The Eighth Circuit has also held that

a firearm facilitates or has the potential to facilitate felony-drug possession in the same manner

as felony-drug trafficking -- by protecting a defendant or his drugs.  See United States v. Bell,

310 F.3d 604, 605-606 (8th Cir. 2002)(per curiam).  The Tenth Circuit reached a similar

conclusion in an unpublished opinion.  See United States v. Fent, 199 F. App'x 724, 727 (10th

Cir. 2006)(unpublished)(holding that the enhancement applied where the defendant possessed a

firearm in connection with possessing methamphetamine).

There is no requirement that a certain amount of narcotics be recovered for § 2K2.1(b)(6)

to apply.  See United States v. Condren, 18 F.3d 1190, 1999 (5th Cir. 1994)(holding that the 4-

---

[6]Section 2K2.1(b)(5) is now § 2K2.1(b)(6).  See U.S.S.G. § 2K2.1.

level enhancement "may be based on any felony, including, as here, felony possession of a small amount of drugs"); United States v. Cunningham, No. CR 06-2493 JB, 2008 WL 6049940, at *8 (D.N.M. Oct. 29, 2008)(Browning, J.).   Accordingly, courts have applied the 4-level enhancement in cases where small amounts of narcotics were recovered.   See, e.g., United States v. Washington, 340 F.3d 222, 231 (5th Cir. 2003)(rejecting the defendant's argument that "the quantity of drugs seized was too minute for anything other than personal use and that the government failed to establish a connection between the firearms and the drugs," because a controlling Fifth Circuit case -- United States v. Condren, 18 F.3d 1190 (5th Cir. 1994) -- held that "a defendant possessing the firearm 'in connection with' either drug possession or distribution triggered the sentence enhancement"); United States v. Green, 255 F. App'x 473, 474 (11th Cir. 2007)(unpublished)(upholding enhancement for having firearm and small amount of drugs for personal use); United States v. Moran-Paz, 35 F. App'x 93, 93-94 (4th Cir. 2002)(unpublished)(upholding enhancement based upon finding that defendant carried firearm to protect his small amount of drugs).

        In United States v. Justice, 679 F.3d 1251 (10th Cir. 2012), the Tenth Circuit stated that it agrees "with several other circuits that have held that possession of a firearm may facilitate an offense by emboldening the possessor to commit the offense."  679 F.3d at 1255.  In that case, the defendant "was carrying methamphetamine on his person," the "firearms were within easy reach, and they were loaded"; thus, the Tenth Circuit concluded that "[a] reasonable person could find that the firearms gave him a sense of security emboldening him to venture from his home with drugs that someone might wish to take from him by force."  679 F.3d at 1255.  The Tenth Circuit cautioned, however, that "emboldenment is not always present when firearms are near drugs."   679 F.3d at 1256 (citing United States v. Jeffries, 587 F.3d 690, 691-695 (5th

Cir. 2009)(rejecting the emboldenment theory when the defendant took a gun from another man after a violent altercation, got into his car, and picked up his girlfriend; the police stopped the defendant almost immediately thereafter, and found the gun on the driver's seat and a rock of cocaine on the floor behind the seat, because, even if the cocaine belonged to the defendant, the evidence was insufficient to establish that the gun emboldened him); United States v. West, 643 F.3d 102, 115-16 (3d Cir. 2011)(rejecting application of emboldenment theory when marijuana found in glove compartment and revolver found in backpack in trunk of defendant's car); United States v. Smith, 535 F.3d 883, 886 (8th Cir. 2008)(holding that emboldenment theory not applicable because defendant did not venture from home into public with the drugs or firearms)). The Tenth Circuit emphasized that the factual setting must support the emboldenment theory, but concluded that,

> when the defendant is out and about, with drugs on his person and a loaded firearm within easy reach, one can infer from the proximity of the weapon to the drugs is not coincidental and that the firearm "facilitated, or had the potential of facilitating," the drug offense by emboldening the possessor.

United States v. Justice, 679 F.3d at 1256 (citation omitted).

An enhancement under § 2K2.1(b)(6) may be applied even though the felony in connection with which the firearm is possessed was not an offense for which the defendant was convicted. See United States v. Gambino-Zavala, 539 F.3d 1221, 1230 n.3 (10th Cir. 2008). In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that, even after United States v. Booker, as long as the guidelines are considered advisory, facts relevant to sentencing still need be proved only by a preponderance of the evidence. See 408 F.3d at 684-685. See also United States v. Dalton, 409 F.3d 1247, 1252 (10th Cir. 2005)("Booker therefore does not render judicial fact-finding by a preponderance of the evidence per se unconstitutional.").

The Court has noted that the 4-level enhancement has four distinct elements and that "[t]he United States must prove that the defendant: (i) used or possessed; (ii) any firearm or ammunition; (iii) in connection with; (iv) another felony offense." United States v. Kepler, No. CR. 11-1946 JB, 2012 WL 592422, at *5 (D.N.M. Feb. 14, 2012)(Browning, J.)(citing U.S.S.G. § 2K2.1(b)(6)).   In United States v. Kepler, the United States and the defendant stipulated that § 2K2.1(b)(6)'s 4-level enhancement did not apply, and the Court accepted the stipulation, because there was a lack of evidence regarding whether the defendant or some other occupant in the house owned the locked box that contained methamphetamine and a handgun. See 2012 WL 592422, at *6.  The Court explained that,

> [g]iven that the Court has no ability to gather or present evidence to support a sentencing enhancement, the Court is dependent in many ways on the United States to assess the strength of its arguments and evaluate whether it can prove that a particular enhancement applies.   While it is possible that the methamphetamine is attributable to Kepler, the evidence before the Court does not support a factual finding to that effect by a preponderance of the evidence. Without proof that Kepler committed another felony offense, the United States cannot establish that an enhancement under U.S.S.G. § 2K2.1(b)(6) applies.

2012 WL 592422, at *6.

In United States v. Cunningham, No. CR 06-2493 JB, 2008 WL 6049440 (D.N.M. Oct. 29, 2008)(Browning, J.), the Court applied § 2K2.1(b)(6)(B)'s 4-level enhancement where the defendant was apprehended carrying a small amount of crack cocaine -- one bag in his jacket and one bag in his hat -- and had a handgun in the center console of his vehicle, which was "close at hand and readily accessible."  2008 WL 6049940, at *13-14.  In United States v. Pacheco, No. CR 13-2643 JB, 2014 WL 3421063 (D.N.M. July 8, 2014)(Browning, J.), the Court applied § 2K2.1(b)(6)(B)'s 4-level enhancement when a firearm was found in the defendant's trailer with a small amount of heroin, two digital scales, and drug paraphernalia.  See 2014 WL 3421063, at *12-14.  The Court reasoned that, in addition to the close proximity between the

drugs and the firearm, the defendant could have used the firearm to facilitate drug trafficking by using it to protect himself and his drug supply. See 2014 WL 3421063, at *14. In United States v. Barela, No. CR 13-3515 JB, 2015 WL 1918017, at *13 (D.N.M. Apr. 6, 2015)(Browning, J.), the Court applied § 2K2.1(b)(6)(B)'s 4-level enhancement where the police discovered a rifle, a handgun, 7 grams of heroin, a box of hypodermic needles, and six scales in a closet in the defendant's residence. See 2015 WL 1918017, at *13.

## ANALYSIS

The Court overrules Tobanche's objection to the PSR's proposed 4-level enhancement under § 2K2.1(b)(6)(B). Section 2K2.1(b)(6)(B) provides for a 4-level enhancement "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). "Another felony offense" means "any federal, state, or local offense . . . punishable by a term of imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1(b)(6), cmt. n. 14(C). The Application Notes to § 2K2.1(b)(6)(B) state that the enhancement applies "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia," because the Sentencing Commission has concluded that "the presence of the firearm has the potential of facilitating another felony offense." U.S.S.G. § 2K2.1(b)(6), cmt. n. 14(B)(ii). By contrast, for all other felony offenses -- including drug-possession offenses -- the enhancement applies only if the firearm "facilitated or had the potential of facilitating" the offense; in other words, no presumption is made for those offenses. U.S.S.G. § 2K2.1(b)(6), cmt. n. 14(A).

There is sufficient evidence for the Court to conclude that Tobanche was involved in a drug-trafficking offense. "[S]entencing factors need only be proven by a preponderance of the

evidence," and the Court "is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011). Deputies discovered a distribution quantity -- 105.4 grams -- of pure methamphetamine in the vehicle that Tobanche was driving. See United States v. Waterbury, 206 F. App'x 805, 810 (10th Cir. 2006)(unpublished)(explaining that 37.27 grams of methamphetamine is "an amount consistent with distribution quantities"); United States v. Crawford, 87 F. App'x 890, 892 (4th Cir. 2004)(unpublished)("Possession of . . . a quantity of drugs larger than a personal-use amount may indicate a defendant's intent to distribute."). The methamphetamine was not concealed under a seat, in another occupant's pocket, or buried in a bag. Instead, it was easily accessible to and within arm's reach of Tobanche -- deputies discovered it lying inside a glove on top of an open speaker cone in the Impala's back seat. Moreover, surveillance video shows Tobanche rummaging around in the Impala's front seat, trunk, and back seat for nearly seventeen minutes while placing items in and out of three different bags, and changing his clothes. Tobanche has an extensive history of drug convictions: one conviction for trafficking heroin, one for trafficking cocaine, one for possessing cocaine, and another for transporting drug-trafficking proceeds. See United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011)(upholding the district court's application of § 2K2.1(b)(6)(B)'s 4-level adjustment, in part, because "the court was entitled to take into account that the defendant had a prior felony conviction for distributing crack cocaine"); United States v. LePage, 477 F.3d 485, 489 (7th Cir. 2007)(upholding the district court's application of § 2K2.1(b)(6)(B)'s 4-level adjustment, and noting that the defendant's prior drug conviction is "consistent with an inference that he is a trafficker"). Tobanche also had three different guns in close proximity to him when the offense occurred: a handgun on his person, a shotgun under the Impala's hood, and a handgun in the Impala's trunk. See United

States v. Cruz, 805 F.2d 1464, 1474 (11th Cir. 1986)("[G]uns are a tool of the drug trade.").  The Court also finds it difficult to conclude that it was a mere coincidence that somebody -- by all accounts, a random person whom Tobanche did not know -- drove up and shot Tobanche in the neck while a large quantity of methamphetamine was sitting in the vehicle that Tobanche was driving.  See United States v. Hromada, 49 F.3d 685, 689 (11th Cir. 1995)("Guns and violence go hand-in-hand with illegal drug operations.").  Tobanche suggests that either Ruiz or Chavez individually, or both of them working together, were trafficking the methamphetamine without involving Tobanche.  If that were the case, however, there was no reason for them to leave such a large amount out in the open, especially while Tobanche was rummaging around in the Impala's back seat.  See United States v. Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991)("[I]t runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes.").  Based on these factors, it is more likely than not that Tobanche possessed with intent to distribute 50 grams or more of methamphetamine, which is a federal felony under 18 U.S.C. § 841(a).  Given that § 2K2.1(b)(6)(B) requires the gun only to be in close proximity to a drug-trafficking offense, and that surveillance video showed Tobanche holding a gun immediately after he exited the Impala -- where the deputies discovered the methamphetamine -- the Court concludes that § 2K2.1(b)(6)(B) applies.

The Tenth Circuit reached a similar conclusion in United States v. Gambino-Zavala, 539 F.3d 1221 (10th Cir. 2008).  There, the police searched the defendant's apartment and discovered a handgun in the living room closet, an AK-47 under a bed, and a large quantity of heroin in the kitchen cabinet.  See 539 F.3d at 1229.  Although the defendant shared the apartment with his brother and a friend, and there was no direct evidence that the defendant was even aware of the heroin, the Tenth Circuit upheld the district court's conclusion that the defendant possessed the

weapons in connection with a drug-trafficking offense, because "[t]he amount of drugs the police recovered was substantial and the drugs were located in an area of the apartment that a joint occupant would regularly access."  539 F.3d at 1230.

As in United States v. Gambino-Zavala, the deputies recovered a substantial amount of methamphetamine from the vehicle that Tobanche was driving, and the drugs were located in an area that an occupant of a vehicle would regularly access: the back seat.  Indeed, the connection between Tobanche and the methamphetamine in this case is even stronger, because, unlike in United States v. Gambino-Zavala, where there was no evidence that the defendant had ever accessed the kitchen cabinet, Tobanche rummaged around in the trunk, front seat, and back seat of the Impala for nearly seventeen minutes before the incident occurred.  There was also no indication that the defendant in United States v. Gambino-Zavala had a prior history of drug-trafficking offenses.  If the connection between the defendant in United States v. Gambino-Zavala and the drug-trafficking offense was sufficient to apply § 2K21(b)(6)(B), the Court sees no sound reason why the adjustment would not apply to Tobanche.

Nor is the Court required to hold that Tobanche committed a drug-trafficking offense for § 2K2.1(b)(6)(B) to apply.  Section 2K2.1(b)(6)(B) requires only that the defendant possessed or used a firearm "in connection with another felony offense."  U.S.S.G. § 2K2.1(b)(6)(B).  The Court has thus applied § 2K2.1(b)(6)(B) where the defendant committed only a felony drug-possession crime.  See United States v. Hammons, No. CR 07-1164 JB, 2012 WL 119616, at *17 (D.N.M. Jan. 12, 2012)(Browning, J.)("The broader application of this guideline to all felonies reflects the United States Sentencing Commission's intent that this guideline apply in a broader range of circumstances, including simple felony drug possession crimes.").  Under New Mexico law, possessing any quantity of methamphetamine is a felony offense.  See N.M. Stat. Ann. § 30-

31-23E ("A person who violates this section with respect to . . . methamphetamine . . . is guilty of a fourth degree felony . . . ."). Three elements must be established for a defendant to be convicted of possession of methamphetamine under N.M. Stat. Ann. § 30-31-23E: (i) the defendant must have methamphetamine in his possession; (ii) the defendant must know it was methamphetamine; and (iii) the possession must occur in New Mexico on a specific day. See N.M.R.A., Crim. UJI 14-3104. Moreover, "[a] person is in possession of methamphetamine when he knows it is on his person or in his presence, and he exercises control over it," and "[t]wo or more people can have possession of a substance at the same time." N.M.R.A., Crim. UJI 14-3130. The Court concludes that Tobanche more likely than not knew that methamphetamine was in his possession and exercised control over it, because of (i) the quantity of the methamphetamine; (ii) its location in an easily accessible area in the vehicle that Tobanche was driving; (iii) Tobanche's actions of rummaging through the Impala's back seat, front seat, and trunk for nearly seventeen minutes before the incident occurred; (iv) the multiple firearms in the Impala; and (v) Tobanche's history of drug offenses. Moreover, there is no dispute that the possession occurred in New Mexico on September 2, 2014. Accordingly, even if there were insufficient evidence to demonstrate that Tobanche possessed methamphetamine with the intent to distribute it -- and the Court thinks there is sufficient evidence to support such a finding -- the Court concludes that Tobanche possessed methamphetamine in violation of N.M. Stat. Ann. § 30-31-23E

The Court also concludes that Tobanche's possession of a firearm "facilitated or had the potential of facilitating" Tobanche's drug-possession offense. U.S.S.G. § 2K2.1(b)(6), cmt. n. 14(A). Courts are more likely to apply § 2K2.1(b)(6)(B) where the defendant is carrying a firearm in public than when the firearm was discovered in the defendant's home. Compare

United States v. Justice, 679 F.3d at 1255 (applying the enhancement where police found the defendant asleep in a vehicle with methamphetamine in his pocket and a gun next to him on the seat), with United States v. Smith, 535 F.3d at 885 (rejecting the enhancement where there was no evidence that defendant's simultaneous possession of firearms, ammunition, and drug residue in his home was anything other than a mere coincidence).  The Tenth Circuit has noted that, "[w]hen a drug user chooses to carry his illegal drugs out into public with a firearm, there are many ways in which the weapon can facilitate the drug offense and dangerously embolden the offender."  United States v. Justice, 679 F.3d at 1255.  Striking a similar chord, the Court has previously said that it "sees no reason to disregard the natural inference that someone carrying drugs and a gun together is armed to protect his drugs, particularly when that person is out in public."  United States v. Cunningham, No. CR 06-2493 JB, 2008 WL 6049940, at *8 (D.N.M. Oct. 29, 2008)(Browning, J.).  Recognizing that certain categories of guns are more likely to be associated with drug offenses than others, courts are more likely to apply § 2K2.1(b)(6)(B) where the defendant possessed a handgun rather than a long-barreled shotgun or a rifle. Compare United States v. Wyatt, 102 F.3d 241, 243 (7th Cir. 1996)(explaining that the guns found -- a short-barreled rife and a handgun -- are typically used in the drug-trafficking business), with United States v. Massey, 462 F.3d 843, 846 (8th Cir. 2006)(affirming the district court's decision to not apply a § 2K2.1(b)(5) enhancement where, although the defendant possessed twenty-one guns, there was only one pistol and the rest of his guns were rifles and shotguns, which supported the defendant's contention that he was a sportsman and gun collector).  Courts are also more willing to apply § 2K2.1(b)(6)(B) if the defendant's gun is loaded and ready to be used, than if it is unloaded, stowed away, or difficult to reach.  See United States v. Wellington, 468 F. App'x 529, 532 (6th Cir. 2012)(unpublished)("[A] weapon with a

chambered round and the hammer cocked raises a strong inference that Wellington was prepared to use the gun while participating in felony drug sales").  All of these factors weigh in favor of finding that Tobanche's possession of a handgun emboldened his drug possession.  Tobanche possessed a gun in public, he had a handgun rather than a hunting rifle, and the gun was loaded and on his person.

The Tenth Circuit and the United States Court of Appeals for the Eleventh Circuit have upheld the application of § 2K2.1(b)(6)(B) in similar circumstances.  In United States v. Fent, a deputy sheriff pulled over the defendant for speeding, and then arrested him after he failed to produce a driver's license or proof of insurance, and a database check of his name and social security number revealed that his license was suspended.  See 199 F. App'x at 725-26.  The deputy impounded the defendant's truck, and discovered a small amount of methamphetamine and a firearm in a black bag in the truck during an inventory search.  See 199 F. App'x at 726.  The defendant was found guilty after a jury trial of being a felon in possession of a firearm, but was never charged with a drug offense.  See 199 F. App'x at 726.  Nonetheless, the district court concluded that the firearm was possessed in connection with the defendant's felony possession of methamphetamine and applied § 2K2.1(b)(6)(B).  See 199 F. App'x at 727.  The Tenth Circuit affirmed, noting that "the availability of the gun in such close proximity to the methamphetamine was sufficient evidence of a connection between the firearm and the possession of methamphetamine, which is a felony offense in the state of Oklahoma."  199 F. App'x at 727.

In United States v. Chappell, 334 F. App'x 970, 971 (11th Cir. 2009)(unpublished), the defendant was a passenger in a vehicle that the police stopped.  See 334 F. App'x at 971.  After arresting the defendant and the driver on outstanding warrants, the police searched the vehicle, and discovered fragments of methamphetamine in the vehicle's passenger floorboard and seven

rounds of ammunition in the defendant's backpack.  See 334 F. App'x at 971.  The Eleventh Circuit upheld the district court's application of § 2K1.2(b)(6)(B), reasoning that the ammunition "had the potential to facilitate [the defendant's] possession of methamphetamine."  334 F. App'x at 973.

Like in United States v. Fent and United States v. Chappell, Tobanche ventured out in public with illegal drugs.  His reason for carrying a weapon was stronger than the defendants in either of those cases, however, because he carried a distribution quantity of methamphetamine rather than a mere user quantity.  If the defendant's possession of seven rounds of ammunition in United States v. Chappell emboldened his possession of a user quantity of methamphetamine, it is more likely than not that Tobanche's possession of a loaded handgun emboldened his possession of a distribution-quantity of methamphetamine.

Tobanche contends that he possessed the guns solely to protect himself after being shot in an incident purportedly unrelated to drug trafficking.  Courts have rejected arguments identical to Tobanche's, reasoning that a defendant's motivations for carrying a weapon are not mutually exclusive.  See United States v. Fuentes Torres, 529 F.3d 825, 826 (8th Cir. 2008)(affirming application of § 2K2.1(b)(6)(B) where the district court said at the defendant's sentencing hearing: "I think if I go and buy a gun because I'm concerned about my safety but I'm also either dealing or using drugs, it may very well be that I'm using that gun for dual purposes."); United States v. Hardin, 248 F.3d 489, 498 (6th Cir. 2001)("It is possible that the gun was used both to protect his wife and to further his drug business.  Possession need not be exclusive, it can be joint.").  That Tobanche wanted to protect himself from violence generally does not mean that he was unconcerned about violence associated with drug possession or drug trafficking.  Given that Tobanche went out in public to a busy area like a casino with such a large quantity of

methamphetamine in the car that he was driving, it is more likely than not that Tobanche wanted to protect that valuable asset and carried multiple guns with him to be able to do so.

Ultimately, common sense dictates that § 2K2.1(b)(6)(B) should apply in this case. Given that such a large quantity of methamphetamine was in an open area within arm's reach of Tobanche, Tobanche has an extensive history of drug offenses, he had three weapons hidden in different locations in his car, he rummaged around for nearly seventeen minutes in the Impala's back seat, front seat, and trunk, and he was ultimately shot in the neck while a large amount of methamphetamine sat in his car, it is more likely than not that Tobanche's possession of a firearm emboldened his possession of methamphetamine.  The Court will therefore overrule Tobanche's objection to § 2K2.1(b)(6)(B)'s application.

**IT IS ORDERED** that the Defendant's Objection to a Proposed Condition of Supervised Release, filed September 10, 2014 (Doc. 82)("Objection"), is overruled.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
Jon K. Stanford
Charles Barth
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Donald Kochersberger
Business Law Southwest, LLC
Albuquerque, New Mexico

   *Attorneys for the Defendant*